IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Jan M. Pheneger, | Case No. 3:06CV821 |
| Plaintiff, | |
| v. | ORDER |
| City of Lima, Ohio, et al., | |
| Defendants. | |

This is a case alleging civil rights violations under 42 U.S.C. §§ 1983, 1985, 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiff Jan M. Pheneger alleges that police officers Dunham, Haslett and Engelman of the Lima, Ohio, Police Department arrested her without probable cause, and, in doing so, injured her through use of excessive force. Jurisdiction exists under 28 U.S.C. §§ 1331 and 1343.

Pending is defendants' motion for summary judgment. [Doc. 34]. For the reasons that follow, defendants' motion shall be granted in part and denied in part.

**Background**

On the evening of April 7, 2004, Larry Brown, a tow truck driver, went to Pheneger's home to repossess a car. Sometime after 11:30 p.m., Pheneger heard noises outside her house. Going out to inquire, she saw her car (titled in her daughter's name) being repossessed.

Plaintiff confronted Brown after he had hooked the car to the tow truck. He explained that he was repossessing the car for non-payment. Plaintiff told Brown that her payments were current. Brown told her there was nothing he could do; the car was already hooked and he was about to

leave. According to Pheneger, Brown did not comply with her request to see his identification or documentation of authority to repossess her vehicle.

Pheneger went inside her house and called the Lima Police non-emergency line. Plaintiff told the dispatcher that her car was being repossessed and that she needed the police. The dispatcher informed Pheneger that the police do not get involved in repossessions but that they could verify the identity of the tow truck driver. Brown also testified that he called the Lima Police Department for assistance.

Minutes after those calls, Officers Haslett and Dunham, Haslett's field training officer, arrived. They were responding to the dispatch they received, which described a woman "yelling, screaming and causing a disturbance in the neighborhood." When they arrived, plaintiff was shouting. She was using profane language and was, according to the officers, quite loud.

Dunham and Haslett approached and attempted to determine what was happening, but, according to the officers, Pheneger continued to yell and refused to listen to them. The rear of the car was hooked to the tow truck and hoisted, and Pheneger was between the car and truck where the connection was made.

Pheneger's boyfriend, Kevin Blanchard, was in an upstairs bedroom. He stated that he could not hear what the officers were saying but could clearly hear Pheneger, and described her as hysterical. He saw her standing between the tow truck and the car and that she refused to move after being asked to do so by the officers. Because Pheneger was between the truck and car, Brown could neither leave with nor unhook the car.

Officer Engelman arrived as back-up minutes after Dunham and Haslett. Engelman also heard Pheneger yelling and refusing to calm down. The officers told her to get out of the way. She

did not, and refused to do so. Because Pheneger would not cease her loud, disruptive conduct and refused to allow Brown to leave either with or without the car, the officers placed Pheneger under arrest.

When the officers arrested Pheneger they handcuffed her, per a Lima Police Department General Directive pertaining to persons taken into custody. She claims the officer made the cuffs extremely tight, and that she immediately complained. According to plaintiff, as soon as she complained the officers crunched the handcuffs tighter.

The officers assert that they used conventional techniques for confirming that the cuffs were not too tight. According to defendants, Haslett, observed by Dunham, placed the handcuffs on Pheneger. They claim that Haslett placed his gloved pinky between the cuffs and her wrist to ensure they were not too tight, then double-locked them. Once cuffs are double locked, according to them, they cannot become tighter.

The officers also say that they responded to plaintiff's complaint that the cuffs were too tight. Dunham claims that he and Haslett unlocked the handcuffs, checked them for tightness, and then double-locked them.

The officers placed Pheneger in a police cruiser and went to speak to Brown. Several minutes later, Engelman returned to the cruiser and drove Pheneger to the police station. Plaintiff claims that the handcuffs remained too tight, and that she repeatedly complained about the handcuffs en route but was ignored. Defendants claim that she complained only once and that Engelman told Pheneger how to sit so that she was not placing her weight against the handcuffs.

The trip to the station lasted about five to ten minutes. Once inside, Engelman placed Pheneger in a holding room while he took basic information and filled out the property inventory

form. He was gone for approximately ten minutes while plaintiff remained in the cell. When he returned, Engelman asked Pheneger to remove her coat. According to plaintiff, she told Engelman she could not remove her coat until he removed the handcuffs, and in response Engelman explained that handcuffs were not intended to be comfortable. She claims that, by this time, her arms were numb and that she would occasionally feel intense pains shooting up and down both arms.

Engelman then undid the handcuffs to allow Pheneger to take off her coat. Pheneger claims that her wrists were swollen and bruised, and that Engelman saw the marks but did not offer her medical attention. Defendants claim that Pheneger did not complain that the cuffs were too tight or that she needed medical attention while at the station. They also state that she signed a property inventory form, which contained a medical section, without listing any complaints.

The officers arrested Pheneger around midnight; she remained handcuffed for twenty-five minutes. She was processed and released at 1:04 a.m. The officers charged her with obstructing official business for her non-compliant and disruptive conduct. The prosecutor declined to proceed on the officers' complaint.

After being released, Pheneger went to a hospital emergency room in Lima for medical treatment. She was initially diagnosed with bilateral wrist contusions and referred to an orthopedic specialist. Later that day, April 8, 2004, Pheneger went to see the Mayor of Lima. At his suggestion, Pheneger had photographs taken of her wrists. Ultimately, because of the allegedly permanent injuries incurred from the excessive tightness of the cuffs, plaintiff had carpal tunnel surgery.

**Discussion**

Summary judgment is proper where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. In considering a motion for summary

judgment, the court will construe all facts in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). There are no genuine issues of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Id.* If the movant carries its burden of showing an absence of evidence to support a claim, then the nonmovant must demonstrate by affidavits, depositions, answers to interrogatories, and admissions that a genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-325 (1986).

### 1. Qualified Immunity

Defendants, as City of Lima police officers, were acting under color of law. They have raised the affirmative defense of qualified immunity, as provided to governmental employees when operating within the scope of their assigned duties.

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.*

The Supreme Court has held that the court's initial inquiry must be "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). As the Court further stated,

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition.

*Id.*

In defining "clearly established," the Court explained that "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, *supra*, 533 U.S. at 202. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law")).

### a. Probable Cause and Lawful Arrest

The first step in the immunity analysis is to determine whether, taken in a light most favorable to the plaintiff, the facts alleged show the officers' conduct of arresting plaintiff violated a constitutional right.

To comply with the Fourth Amendment, an arrest must be objectively reasonable; an arrest is reasonable if supported by probable cause. Probable cause to make an arrest exists if the facts and circumstances within the arresting officer's knowledge are "sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Ohio courts use the same rule, *State v. Ratcliff*, 95 Ohio App.3d 199, 205 (1994), and interpret "this definition to include the 'totality' of facts and circumstances within a police officer's knowledge." *Id.*

Whether there is probable cause for an arrest depends on whether there are sufficient "facts and circumstances within the officer's knowledge" to warrant a prudent officer to believe that the suspect had committed or was about to commit an offense. *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *Beck*, *supra*, 379 U.S. at 90. The officer's actions are measured by what a reasonable officer would have done under the same circumstances. *Sandul*, *supra*, 119 F.3d at 1256. If a reasonable officer under the same circumstances would have believed that the arrest was lawful, then the arresting officer is entitled to qualified immunity. *Id.*

The record shows that the officers had probable cause to arrest Pheneger. Her disorderly and disruptive conduct interfered with the officers' ability to keep the peace and justified the arrest. She was later charged with obstructing official business.[1]

---

[1]

Defendants argue that they had probable cause to arrest for disorderly conduct or obstruction of official business.

Section 2917.11 of the Ohio Revised Code [disorderly conduct], provides in relevant part:

> (A) No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following: . . .
>
>> (2) Making unreasonable noise . . .
>>
>> (4) Hindering or preventing the movement of persons . . . to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender;
>>
>> (5) Creating a condition that . . . presents a risk of physical harm to persons or property, by any act that serves no lawful and reasonable purpose of the offender.

Section 2921.31 of the Ohio Revised Code [obstructing official business], provides in pertinent part:

> (A) No person, without privilege to do so and with purpose to prevent, obstruct or delay the performance by a public official of any authorized act within his official

7

The parties disagree as to whether Pheneger's actions of being loud and profane in the night hours sufficed for an arrest for disorderly conduct or obstruction of official business. Plaintiff argues that she was not disorderly because she was not causing inconvenience, annoyance, or alarm to another person or obstructing official business because the activity was a private car repossession.[2]

In the Sixth Circuit, probable cause to arrest exists when the facts and circumstances known to an officer suffice for a reasonably cautious officer to believe some offense, not necessary the offense charged, has been or was being committed. *See Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 676 (6th Cir. 2005) ("where no probable cause exists to arrest a plaintiff for a particular crime, but . . . probable cause exists to arrest that plaintiff for a related offense, the plaintiff cannot prevail in a suit alleging wrongful arrest brought pursuant to 42 U.S.C. § 1983"); *Avery v. King*, 110 F.3d 12, 14 (6th Cir. 1997) ("A police officer need not actually have had the crime for which probable cause existed in mind at the time of the arrest; rather, the question is whether the conduct that served as the basis for the charge for which there was no probable cause could, in the eyes of a similarly situated reasonable officer, also have served as the basis for a charge for which there was probable cause.") (internal quotation marks omitted).

---

      capacity, shall do any act which hampers or impedes a public official in the performance of his lawful duties.

[2]

However, an officer's conduct during a repossession does not violate the Fourth Amendment where the conduct is limited to keeping the peace. Here, Pheneger's conduct interfered with their ability to keep the peace. The officers acted only after she impeded them from this duty.

On this point I will note that the officers had no basis for trying to stop the repossession. The tow truck operator was simply doing a job he was told to do. If the payments were current, as the plaintiff contends, then the bank ordering the repossession could have been sued in civil court.

In this case, the officers arrived after their dispatcher received calls from Pheneger and Brown. They understood a woman was "causing a disturbance in the neighborhood." The officers observed Pheneger's disruptive behavior, including her refusal to follow their instructions, yelling, cursing, refusing to move, and preventing the tow truck driver from lowering the car and from leaving.

Pheneger's persistence at midnight in speaking loudly to the officers in a residential neighborhood and her refusal to remove her body from a place of danger between the car and tow truck support her arrest. Similar behavior has led to a conviction for obstruction of official business. *See Ohio v. Grooms*, 2005 WL 407573, *6-7 (Ohio App. Feb. 22, 2005) (evidence that defendant became physically and verbally abusive, screamed at an officer with her face six inches from his, impeded his ability to complete paperwork incident to arrest of defendant's mother, and refused to leave scene when ordered to do so found sufficient to support conviction of obstructing official business).

These officers, in resolving the situation as they did rather than leaving the parties to their own devices, especially given the risk of injury that plaintiff had created for herself, are, moreover, entitled to immunity under *Saucier*, as noted above, because the plaintiff's right not to be taken into custody in such circumstances is not "clearly established."

### b. Excessive Force

Pheneger asserts a Fourth Amendment excessive force claim against the officer who applied the handcuffs and the other officers present.[3] She alleges the officers used excessive force when

---

3

With regard to her claims against those other officers, the Sixth Circuit has held that a police officer who fails to act to prevent the use of excessive force may be held liable when "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer

9

putting on the handcuffs and ignored her complaints, and that she suffered injuries needing medical attention, including surgery.

Use of force violates the Fourth Amendment if it is excessive under objective standards of reasonableness. *Graham v. Connor*, 490 U.S. 386 (1989). In the context of claims based on excessively tight handcuffs, an arrestee's right to be free from being injured by excessively tight handcuffs was well established at the time of plaintiff's arrest.

Thus, in *Martin v. Heideman*, 106 F.3d 1308, 1313 (6th Cir. 1997), the Sixth Circuit held that officers cannot lawfully use unduly tight handcuffing during an arrest. A reasonable official would know that employing handcuffs in such a manner violates an arrestee's rights. *Burchett v. Kiefer*, 310 F.3d 937, 944-45 (6th Cir. 2002); *Martin*, *supra*, 106 F.3d at 1312-13. If Pheneger can prevail on her claim of excessive force, she can overcome the defendants' immunity defense.

To establish an excessive force claim for tight handcuffs, Pheneger must show: 1) she complained to the officers that the handcuffs were too tight; 2) the officers ignored her complaints; and 3) as a result of the handcuffs being too tight, she sustained injury. *Lyons v. City of Xenia*, 72 417 F.3d 565, 575-576 (6th Cir. 2005).[4]

---

had both the opportunity and the means to prevent the harm from occurring." *Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir. 2006) (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1977)); *see also Barton v. Norrod*, 106 F.3d 1289, 1299 (6th Cir. 1997) (holding that an officer present where other officers are violating a person's civil rights may have a duty to intervene).

[4]

The Eastern District of Michigan has stated that "[s]omething more than negligence, or the mere failure to heed a prisoner's complaints, must be shown. If every case in which a person taken into custody with handcuffs were to give rise to a question of constitutional dimension requiring factual inquiry, literally every such case would require submission to the fact finder." *Nemeckay*, *supra*, 894 F.Supp. at 315. I recognize that there is strong judicial reluctance to take in every claim of too tight handcuffs; however, in this case, I find that plaintiff's allegations are sufficient to raise a claim that more than brief discomfort resulted. Her claims of proximate cause between the tight cuffs and the injuries to her wrists necessitate a factual inquiry as to the conduct of the officers.

Plaintiff claims that, when the officers initially handcuffed her, they placed the cuffs so tightly around her wrists that she immediately experienced extreme pain in her hands and wrists. She further alleges that before she was placed in the cruiser, defendants tightened the handcuffs.

Once at the jail, she asserts, she pleaded with Engelman to loosen or remove the handcuffs but he refused to do so. She states that she told Engelman that she could not feel her hands and she was experiencing unbearable pain throughout her arms. She continued that her hands were swollen to twice their normal size and that she continued to experience terrible agony and pain in both arms.

Further, she claims that as a direct and proximate result of defendants' conduct she had to receive emergency medical care. She was diagnosed with bilateral carpal tunnel syndrom and underwent post-arrest wrist surgery.

To be sure, defendants' evidence as to whether the handcuffs were improperly applied to plaintiff's wrists, and, if she had visible marks from the cuffs, how they came to be there, differs from plaintiffs' evidence. Defendants also dispute whether plaintiff incurred any injuries; according to them, pre-existing conditions necessitated her subsequent surgery.

All these contentions simply show that there are disputed issues of material fact for the jury to decide.

Taking plaintiff's allegations that she complained that the handcuffs were too tight, even after defendants readjusted the cuffs, I "must ask whether Defendants had reason to know that, under the circumstances of this particular arrest, failure to heed Plaintiff's complaints could be considered an excessive use of force." *Nemeckay v. Rule*, 894 F.Supp. 310, 316 (E.D. Mich. 1995).

In examining whether the right is clearly established, the Court of Appeals has explained:

> As this circuit has analyzed the qualified immunity issue in excessive force cases, the
> question of whether the reasonable officer would have known his conduct violated

11

> clearly established constitutional rights can be answered by the initial inquiry of whether the officer's use of force was objectively reasonable. *See Martin*, 106 F.3d at 1312-13; *Walton [v. City of Southfield]*, 995 F.2d [1331], 1342 [(6th Cir.1991)]. It is clear from this circuit's analyses in various excessive force decisions that, having concluded that the right to be free from excessive force is clearly established, whether we grant qualified immunity in a particular case depends upon whether the officer did, in fact, use excessive force (i.e., force that was not objectively reasonable). *Martin*, 106 F.3d 1312-13; *Walton*, 995 F.2d at 1342; *Kain [v. Nesbitt]*, 156 F.3d [669], 672-73 [(6th Cir.1998)]. To put it another way, if there is a genuine issue of fact as to whether an officer's use of force was objectively reasonable, then there naturally is a genuine issue of fact with respect to whether a reasonable officer would have known such conduct was wrongful.

*Kostrzewa v. City of* Troy, 247 F.3d 633, 641-42 (6th Cir. 2001). *See also Martin*, *supra*, 106 F.3d at 1313 (finding that where a genuine issue of fact exists as to whether the defendant police officer used excessive force in handcuffing the plaintiff, it is error to grant the officer qualified immunity).

The decision in *Grooms v. Dockter*, 1996 WL 26917 (6th Cir. Jan. 23, 1996) (unpublished disposition), is persuasive. In *Grooms*, the arresting officer handcuffed Grooms extremely tightly before placing him in the police cruiser. Grooms repeatedly told the officers that the handcuffs were too tight and that he was losing circulation and feeling in his hands. He was in visible pain, and was left handcuffed in the cruiser for several minutes before leaving the scene of the arrest. At the station, the officers left Grooms in the handcuffs despite obvious and continuing indications that he was in pain. Grooms suffered physical injuries to his hands and wrists and was referred to a specialist who diagnosed bilateral carpal tunnel syndrome caused by the handcuffing. The district court denied the police officers' motion for summary judgment based on qualified immunity, and the court of appeals affirmed.

Were the jury to credit plaintiff's version of the incident, *Neague v. Cynkar*, 258 F.3d 504 (6th Cir. 2001), on which the defendants rely for support for their motion for summary judgment

would be distinguishable. In that case, unlike this case, the plaintiff failed to present medical evidence of any resultant injuries.

This case is similar to *Patrick v. Vrablic*, 2005 WL 3088346 (E.D. Mich. Nov. 16, 2005), in which a motorist had complained about cuffs being overly tight and painful, the complaints were ignored and medical treatment was obtained for the injuries allegedly sustained by the plaintiff. The court denied the defendants' motion for summary judgment. Given the disputed issues of material fact, I must do likewise as to plaintiff's claim of excessive force.

### Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT the defendants' motion for summary judgment [Doc. 34] be, and the same is hereby granted as to plaintiff's claim that her arrest was unlawful, and denied as to her claim that the officers used excessive force.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge